UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| DEANE BERG, | ) | CIV. 09-4179-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT'S |
| JOHNSON & JOHNSON; | ) | MOTION FOR SUMMARY |
| JOHNSON & JOHNSON | ) | JUDGMENT |
| CONSUMER COMPANIES, INC.; | ) | |
| LUZENAC AMERICA, INC.; | ) | |
| JOHN DOES/JANE DOES 1-30; | ) | |
| UNKNOWN BUSINESSES | ) | |
| AND/OR CORPORATIONS A-Z, | ) | |
| | ) | |
| Defendants. | ) | |

Deane Berg alleges claims for strict liability (failure to warn), negligence (failure to warn), breach of warranties, civil conspiracy, acting in concert, and gross negligence (Docket 1) against defendant Luzenac America, Inc. and others. Luzenac moves for summary judgment (Docket 92) on all claims. Berg resists the motion. For the following reasons, Luzenac's motion is granted in part and denied in part.

**FACTUAL BACKGROUND**

Berg was diagnosed with ovarian cancer in December of 2006. She was 49 years old at the time. Prior to her diagnosis, Berg used codefendant Johnson & Johnson products—Johnson's Baby Powder and Shower to

Shower—to dust her perineum for feminine hygiene purposes. She applied the products on a daily basis from 1975 until 2007.

Talc is one of the main ingredients in Johnson's Baby Powder and Shower to Shower. Talc is a naturally occurring mineral that is mined from the ground and used in various applications. For example, it is used in foodstuffs, pharmaceutical products, paper, paints, plastics, rubber, ceramics, adhesives, asphalt, fertilizers, pesticides, and cosmetics.

Luzenac has supplied talc to Johnson & Johnson since 1989 under the terms of various supply agreements. Before supplying talc to Johnson & Johnson, the talc needed to meet specifications given by Johnson & Johnson. These specifications related to the brightness, purity, and fineness of the talc, and Luzenac was also required to comply with certain processing techniques at the direction of Johnson & Johnson. Included in the supply agreements was the following exclusion of warranties clause:

> **EXCEPT FOR THE WARRANTIES CONTAINED IN THIS AGREEMENT, SELLER MAKES NO OTHER WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED, IN FACT OR BY LAW, WHETHER OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR OTHERWISE**.

Docket 93 at 2.

Luzenac and Johnson & Johnson are members of the Cosmetic, Toiletry, and Fragrance Association (CTFA).[1] In 1992, the CTFA created the Talc

---

[1] The CTFA is now known as the Personal Care Products Council.

2

Interested Party Task Force in response to a study that suggested that an association existed between the use of talc in the perineal area and the occurrence of ovarian cancer in women. The task force worked to find experts to defend the talc industry, and it also began to prepare talking points to be used in press releases regarding the association between talc use and ovarian cancer.

In 2000, the National Toxicology Program (NTP), a part of the Department of Health and Human Services, began investigating the association between talc use and ovarian cancer. The task force focused its efforts on convincing the NTP that talc was a safe material. The end result was that the NTP did not label talc as a carcinogen.

Berg asserts that it has been about 40 years "since talc producers, the cosmetics industry, in general, and Johnson & Johnson, in particular, have been aware of a possible connection between cosmetic talc use and ovarian cancer." Docket 102 at 3. Thus, she has brought this products liability action against Johnson & Johnson and Luzenac.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of her

case on which she bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is precluded if there is a dispute in facts that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

Because this is a diversity action, the court applies the law of the state in which it sits. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). Thus, South Dakota law applies to Berg's claims.[2]

## ANALYSIS

Luzenac argues that it is neither strictly liable nor negligently liable to Berg because it had no duty to warn her of any alleged dangers associated with her talc use. Further, Luzenac argues that it did not breach any warranties, express or implied, that it may have owed to Berg as a third-party beneficiary.

---

[2] The parties do not dispute that South Dakota law applies.

4

Lastly, Luzenac argues that Berg's claims of civil conspiracy and acting in concert fail because they cannot exist on their own.

## I.     **Duty to Warn—Strict Liability and Negligence**

Luzenac relies on the raw material supplier doctrine[3] or, alternatively, the sophisticated intermediary doctrine, to support its position that it did not owe Berg a duty to warn,[4] under either a strict liability theory or a negligence theory, of any dangers associated with Johnson & Johnson products.

The parties agree that *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d 1050 (8th Cir. 1996) [hereinafter *In re TMJ Litig.*], controls

---

[3] The raw material supplier doctrine is also referred to as the component part doctrine. *See In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d 1050, 1056 n.6 (8th Cir. 1996) ("We believe it makes no difference whether FEP film is characterized as a 'component part' or a 'raw material.' "). In its brief, Luzenac called the doctrine the "bulk supplier doctrine," but consistently cited to *In re TMJ Litig.*—a case analyzing the raw material supplier doctrine. Because the parties agree that *In re TMJ Litig.* controls the outcome of this case, the court will apply the raw material supplier doctrine and refer to it as such.

[4] Whether Luzenac owed Berg a duty to warn is a question of law. *See Janis v. Nash Finch Co.*, 780 N.W.2d 497, 500 (S.D. 2010) ("[T]he existence of a duty is a question of law to be determined by the court.").

the outcome of this case.[5] In *In re TMJ Litig.*, the Eighth Circuit Court of

Appeals held:

> If . . . the finished product was unreasonably dangerous because
> the [raw material] was unsuited for the particular use that the
> finished product manufacturer chose to make of it, then the defect
> is in the design of the finished product rather than in the design of
> the [raw material]. In these cases, it is the finished product
> manufacturer and not the [raw material] supplier that may be held
> strictly liable.

*Id.* at 1056. Likewise, "raw material . . . suppliers have no duty to warn the

ultimate consumer of other companies' finished products if the raw materials

. . . have multiple safe uses and are not inherently dangerous." *Id.* at 1058.

---

[5] The parties did not cite and the court is unaware of any South Dakota
case that specifically addresses the raw material supplier doctrine. Thus, the
court must determine what the South Dakota Supreme Court "would probably
hold were it to decide the issue." *Farr v. Farm Bureau Ins. Co.*, 61 F.3d 677, 679
(8th Cir. 1995). In making this determination, the court may consider relevant
state precedent, analogous decisions, scholarly works, and judicial decisions
from other jurisdictions with similar doctrinal approaches to legal matters. *Id.*
A number of states endorse the raw material supplier defense. *See generally
Kealoha v. E.I. du Pont de Nemours & Co.*, 82 F.3d 894, 900 n.7 (9th Cir. 1996)
(noting endorsement by Hawaii, Michigan, Missouri, California, Connecticut,
Minnesota, New Jersey, North Carolina, North Dakota, Oklahoma,
Pennsylvania, and Utah); *see also Davis v. Komatsu America Ind. Corp.*, 42
S.W.3d 34, 38-39 (Tenn. 2001) (noting that "every court presented with the
issue has adopted the component parts doctrine").  Moreover, in *Moor v. Iowa
Mfg. Co.*, 320 N.W.2d 927, 928 (S.D. 1982), the South Dakota Supreme Court
applied reasoning that parallels the reasoning found in *In re TMJ Litig*. There,
the Supreme Court held that a part, which by itself did not create a danger,
could not form the basis for liability when it was later placed into a defective
design. *Id.* The Supreme Court also noted that the part supplier did not design
the defective product. *Id.* For these reasons, the court predicts that the South
Dakota Supreme Court would apply the raw material supplier doctrine to the
facts of this case.

6

Berg does not dispute that talc has multiple safe uses; for example, it is used in foodstuffs, pharmaceutical products, paper, paints, plastics, rubber, ceramics, adhesives, asphalt, fertilizers, pesticides, and cosmetics. Nevertheless, in her brief, Berg alleges that "talc is inherently dangerous to women because it causes ovarian cancer, and talc should never be a component of a personal care product." Docket 102 at 10. But Berg's mere assertion that talc is inherently dangerous does not make it so. Berg must put forth sufficient facts to support her assertion that talc is inherently dangerous. She has failed to do so. All of the evidence that Berg has put forth goes to the limited situation in which talc is applied to a woman's perineum. Thus, talc cannot, in law or fact, be classified as inherently dangerous and placed alongside the likes of "poisons or explosives which must be handled with infinite care." *Grammar v. Mid-Continent Petroleum Corp.*, 71 F.2d 38, 43 (10th Cir. 1934).

Because talc has multiple safe uses and is not inherently dangerous, Luzenac, as a supplier of an inherently safe raw material, had no duty to warn Berg, as the end-user of Johnson & Johnson's finished product, about dangers posed by the design of Johnson & Johnson's product. *See In re TMJ Litig.*, 97 F.3d at 1058-59 ("Under the raw material/component part supplier doctrine, suppliers of inherently safe raw materials have no duty to warn end-users of a finished product about dangers posed by the incorporation of the raw materials

into that product."). The Eighth Circuit has noted various reasons for applying such a rule.

First, the primary duty to warn is owed by the designer of the final product, not the supplier of only one of the product's parts. *Id.* at 1058. This is because the dangerousness of the product stems from its overall design, including how the product is eventually advertised and marketed.[6] *Id.* Here, Luzenac did not control the design, marketing, or advertising of the product. Berg argues that Luzenac controlled the testing and manufacturing of the product because it complied with certain specifications[7] set out by Johnson & Johnson prior to supplying the talc. Such facts, however, do not show that Luzenac had any decision-making authority in the ultimate design of the final product. As Berg points out, these were "extremely detailed specifications that [Johnson & Johnson] require[d] from Luzenac." Docket 102 at 12. The fact that Luzenac complied with Johnson & Johnson's detailed specifications shows that Johnson & Johnson, not Luzenac, had complete control over the design of the final product.

---

[6] Because of the nature of Berg's claim, the determination of how the final product was marketed and advertised is an important factor to incorporate into the court's analysis of the overall design of the product.

[7] The specifications related to the brightness, purity, and fineness of the talc. Luzenac was also required to perform other processing techniques, all at the direction of Johnson & Johnson.

Second, holding Luzenac liable for dangers that allegedly stem from Johnson & Johnson's failure to warn end-users of possible dangers associated with a *particular use* of the product "would not only be unfair, but it also would impose an intolerable burden on the business world." *In re TMJ Litig.*, 97 F.3d at 1057. Luzenac cannot be expected to "retain an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever *any* of its employees received *any* information about *any* potential problems." *Id.* (emphasis added). Also, Luzenac cannot be expected to watch over Johnson & Johnson's shoulder so that it has knowledge of every time Johnson & Johnson decides to market its products in a certain manner. Such an expectation would simply be "unreasonable and impractical" because it places "the burden of testing and developing all" products that incorporate talc as a material on Luzenac. *Id.* "Suppliers of versatile materials . . . cannot be expected to become experts in the infinite number of finished products that might conceivably incorporate their multi-use raw materials[.]" *Id.*

Here, just as in *In re TMJ Litig.*, the responsibility to design a safe product is Johnson & Johnson's alone because, as the finished product manufacturer, advertiser, and marketer, "it knew the specific end-use it intended to make of the [talc] and was in a far better position to evaluate [talc's] safety for that particular end-use." *Id.* at 1058. Luzenac, as a mere supplier of talc, cannot be expected to guarantee the safety of Johnson &

9

Johnson's products. To impose such responsibility on the supplier of an inherently safe raw material would simply extend liability too far. *Id.* Thus, Luzenac owed no duty to warn Berg. Accordingly, summary judgment will be granted in favor of Luzenac on Berg's strict liability and negligence claims. *See id.* at 1059 (noting that plaintiffs' negligent failure to warn claim must fail because "the same analysis which leads us to the conclusion that the defendants had no duty to warn plaintiffs under a theory of strict liability leads us to conclude that they had no duty to warn under a theory of negligence").

## II.   Breach of Warranties

Berg claims that Luzenac breached the implied warranty of merchantability and breached the implied warranty of fitness for a particular purpose.[8] Under South Dakota law, a seller's warranties, whether express or implied, extend "to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." SDCL 57A-2-318. This places third-party beneficiaries in the shoes of the buyer for purposes of enforcing any warranties the seller has made. *Rynders v. E.I. Du Pont De Nemours & Co.*, 21 F.3d 835, 839 (8th Cir. 1994) (interpreting South Dakota law). South Dakota law also allows warranties

---

[8] Luzenac also made reference in its brief in support of its motion for summary judgment to a possible claim for breach of express warranties. Berg did not address any such claim in her response brief (Docket 102), supplemental response brief (Docket 126), or sur-reply brief (Docket 136). Thus, the court assumes that Berg is not pursuing a claim for breach of express warranties against Luzenac.

implied in sales contracts to be modified or excluded in their entirety. SDCL 57A-2-316; *Rynders*, 21 F.3d at 840. "And, to the extent that the contract of sale contains provisions under which warranties are excluded or modified . . . such provisions are equally operative against beneficiaries or warranties under [SDCL 57A-2-318]." *Rynders*, 21 F.3d at 840 (internal quotations omitted). Thus, any implied warranty that Luzenac excluded with respect to Johnson & Johnson is equally excluded with respect to Berg as a third-party beneficiary.

SDCL 57A-2-316(2) controls the exclusion of implied warranties and provides:

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "there are no warranties which extend beyond the description on the face hereof."

Whether a term or clause is conspicuous is a decision for the court. SDCL 57A-1-201(10).

In the sales contracts between Luzenac and Johnson & Johnson, Luzenac included the following language:

> **EXCEPT FOR THE WARRANTIES CONTAINED IN THIS AGREEMENT, SELLER MAKES NO OTHER WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED, IN FACT OR BY LAW, WHETHER OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR OTHERWISE**.

11

Docket 93 at 2; Docket 102-3 at 6-7. The court finds that the use of all capital letters and bolded typeface makes the language used by Luzenac conspicuous. *See Pearson v. Franklin Labs., Inc.*, 254 N.W.2d 133, 141 (S.D. 1977) (noting that language that is printed in capitals or bolded is considered conspicuous). Moreover, the language complies with SDCL 57A-2-316 to the extent that it excludes the implied warranty of merchantability and any implied warranty of fitness for any particular purpose or use. *See Rynders*, 21 F.3d at 841 (noting that implied warranties of fitness can be excluded generally and exclusions of the implied warranty of merchantability must mention merchantability).

Berg argues that the exclusion clause is unconscionable and thus unenforceable. SDCL 57A-2-302 allows the court, as a matter of law, to find any contract clause unconscionable, and the court may refuse to enforce it. When a party claims that a clause is unconscionable, she "shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." SDCL 57A-2-302(2).

Here, Berg has certainly been afforded the opportunity to present evidence as to the commercial setting, purpose, and effect of the exclusion clause in the contracts between Johnson & Johnson and Luzenac as she has submitted three briefs related to this motion. She has failed to submit, however, any evidence to suggest that Johnson & Johnson was in a position where it was unable to bargain for more favorable contract terms or unable to

12

test the talc before it was purchased. *See Schmaltz v. Nissen*, 431 N.W.2d 657, 662 (S.D. 1988) (finding a situation where a party is unable to bargain for more favorable contract terms to be unconscionable). Instead, Berg's sole argument as to why the exclusion clause is unconscionable is that she (not the contracting party, Johnson & Johnson) is left without a remedy for any alleged breach of contract. Berg's argument lacks merit because she does in fact have a remedy—a suit against Johnson & Johnson.[9] As a result, the court finds that Luzenac's exclusion of the implied warranties of merchantability and fitness for a particular purpose are not unconscionable.

Thus, summary judgment is granted in favor of Luzenac with respect to Berg's breach of warranty claims.

### III.   Civil Conspiracy

To establish a prima facie case of civil conspiracy, Berg must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy. *Kirlin v. Halverson*, 758 N.W.2d 436, 455 (S.D. 2008). "Civil conspiracy is not an independent cause of action, but is sustainable only after

---

[9] Berg has failed to cite any authority in which a court has found that an exclusion clause in a contract between two sophisticated parties is unconscionable because it disallows someone in Berg's position (a consumer of a product created by one of the contracting parties) as a third-party beneficiary from bringing a breach of an implied warranty claim.

an underlying tort claim has been established." *Selle v. Tozser*, 786 N.W.2d 748, 756 (S.D. 2010).

Luzenac argues that Berg's civil conspiracy claim fails because there are no remaining claims against Luzenac that could qualify as the underlying tort. There are, however, remaining tort claims against Johnson & Johnson, the alleged co-conspirator, that may constitute the underlying tort. *See Farmland Industries v. Frazier–Parrott Commodities, Inc.,* 871 F.2d 1402, 1409 (8th Cir.1989) ("[T]he doctrine of civil conspiracy extends liability for tort to persons other than the actual wrongdoer but it is the acts causing damage to the plaintiff that give rise to liability for damages, not the conspiracy itself."); *see also Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003) ("Not every conspirator must commit an overt act in furtherance of the conspiracy, so long as at least one does."). Thus, Luzenac's argument is unpersuasive.

Because Luzenac's argument is unpersuasive, the court must now consider whether Berg has put forth enough evidence to establish that a question of fact remains on her civil conspiracy claim. Berg claims that Luzenac and Johnson & Johnson worked together to suppress public knowledge of any possible dangerous effects talc may cause, particularly with respect to ovarian cancer. She alleges that the two companies worked together and organized efforts to ensure that talc was not labeled as a carcinogen. These efforts included finding experts to defend the talc industry and prepare talking

14

points for the press. Docket 102 at 6. As Berg notes in her brief, the defendants' reason for doing so was because they felt that labeling talc as a carcinogen "was incorrect based on the sound science." Docket 126 at 10. Although a close call, the court finds that Berg has met her burden. Thus, summary judgment is denied with respect to Berg's claim for civil conspiracy.

**IV.    Acting in Concert**

Luzenac argued that South Dakota does not recognize a claim for acting in concert, or, alternatively, that Berg's acting in concert claim was subsumed by her civil conspiracy claim. This argument was first asserted in Luzenac's reply brief, which was filed after Berg's initial response to Luzenac's motion for summary judgment. The court allowed Berg to file a supplemental response following Luzenac's reply. Because Berg did not respond to Luzenac's arguments, the court assumes that Berg is not alleging an independent cause of action for acting in concert.

## CONCLUSION

Because Luzenac owed no duty to warn Berg about any dangers associated with Johnson & Johnson's products, Berg's strict liability and negligence claims fail. Moreover, Luzenac effectively excluded the implied warranty of merchantability and any implied warranty of fitness for any particular purpose in its supply contracts with Johnson & Johnson, thereby precluding Berg from bringing such actions as a third-party beneficiary. Lastly,

15

summary judgment is denied with respect to Berg's civil conspiracy claim.

Accordingly, it is

ORDERED that Luzenac's motion for summary judgment is granted in part and denied in part consistent with this order.

Dated March 25, 2013.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

16